## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **LARRY M. JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 10–cv–0135–MJR−SCW** |
| | ) | |
| **MICHAEL RANDLE,** | ) | |
| **SUZANN GRISWOLD,** | ) | |
| **DONALD GAETZ,** | ) | |
| **LLOYD HANNA,** | ) | |
| **JIM WINTERS,** | ) | |
| **MIKE LILLARD, and** | ) | |
| **RONALD BRICKHOUSE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM & ORDER

**REAGAN, District Judge:**

This case, brought by *pro se* Plaintiff Larry Johnson pursuant to 42 U.S.C. § 1983, comes before the Court on four motions. For the reasons explained below, the Court **GRANTS in part and DENIES in part** Defendants' motion for summary judgment (Doc. 131). Additionally, the Court **GRANTS** Johnson's Motion for Leave to Amend (Doc. 126), **DENIES** Johnson's Motion for Judgment on the Pleadings (Doc. 145), and **DENIES** Johnson's motion for summary judgment (contained within Doc. 136).

### PROCEDURAL HISTORY

Johnson, a Buddhist inmate at the Illinois Department of Corrections' (IDOC's) Menard Correctional Center, sued seven defendants on February 19, 2010.[1] In his complaint,

---

[1] Filings subsequent to the original complaint have shown that the docket does not correctly reflect the parties' names. The Clerk is therefore DIRECTED to edit the docket sheet information as follows: replace "Gatez" with "Gaetz;" replace "Loyd" with "Lloyd;" and replace "Brockhouse" with "Brickhouse." In this Order, the Court may refer to the named defendants collectively as "Defendants" where convenient.

Johnson alleges that deficiencies in his diet violate his right to be free from cruel and unusual punishment (under the U.S. Constitution's Eighth Amendment), his right to practice his religion (under the U.S. Constitution's First Amendment and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq.* (RLUIPA)), and the Illinois Unified Code of Corrections, 730 ILCS 5/3-7-2(d).

Broadly stated, Johnson's Eighth Amendment claims are that the IDOC's Lacto-Ovo-Vegetarian (LVO) diet does not provide enough calories, that substitutions by Menard's food service department render the LVO diet even less healthy, and that the textured vegetable protein that makes up the bulk of the protein calories in his diet is a severe health risk. Regarding his right to practice religion, Johnson — who eats an LVO diet because he is Buddhist — claims his religious practice is burdened, because a Menard policy puts him (and all inmates on a special diet) at the back of the chow line. The resulting inadequate time to eat, he says, substantially pressures him to abandon his beliefs. Johnson has sued Defendants in their individual capacities (for a combined $7 million in damages) and in their official capacities (for declaratory relief and an injunction relating to his prison diet).

Pursuant to 28 U.S.C. § 1915A, the undersigned judge issued a threshold order in August 2010. That Order focused on Johnson's Eighth Amendment claims, which proceeded against all Defendants. After a long, contentious, and at times poorly executed discovery process — (see "Defendants' Admissions" below), Defendants moved for summary judgment in November 2011.[2] They also moved to strike Johnson's lengthy response brief (and over nine hundred pages of exhibits); that motion was denied. Defendants secured leave to file a reply, but then did not file one.

---

[2]     Without citing any Federal Rule, Defendants posit that "Plaintiff has failed to state a claim for a First Amendment violation" (Doc. 132, 12). That argument normally is presented via 12(b)(6) motion. But Defendants bury that conclusion among discovered facts and argument about what the evidence does or does not show (*see* Doc. 132, 11–12). They

Before proceeding to the merits of Defendants' summary judgment motion, the Court examines Johnson's suspect invocation of the Illinois Unified Code of Corrections as a basis for relief. *See Tylka v. Gerber Prods. Co.*, 211 F.3d 445, 447–48 (7th Cir. 2000) (**"federal courts are always obliged to inquire** *sua sponte* **whenever a doubt arises as to the existence of federal jurisdiction") (internal citations and quotation marks omitted).** *Accord Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

### JURISDICTION OVER STATE CLAIM

In his complaint, Johnson alleges that Defendants are "in violation . . . 730 ILCS 5/3-7-2(d)" (Doc. 1, 7). That statute, part of Illinois' Unified Code of Corrections, requires that "[a]ll institutions and facilities of the [IDOC] shall provide every committed person with a wholesome and nutritional diet at regularly scheduled hours." **730 ILCS 5/3-7-2(d).** Unfortunately for Johnson, the Unified Code furnishes him no right of action. *See Ashley v. Snyder*, 739 **N.E.2d 897, 902 (Ill. App. 2000) ("Prison regulations . . . were** *never* **intended to confer rights on inmates . . . Instead, Illinois DOC regulations, as well as the Unified Code, were designed to provide guidance to prison officials in the administration of prisons") (emphasis in original).**

Insofar as Johnson asks for relief under the Unified Code, the Court declines to exercise jurisdiction over his claims. *See Bommersbach v. Ruiz*, 461 F. Supp. 2d 743, 756 n.3 **(S.D. Ill. 2006) (collecting cases) ("Were there any serious question of the Court being required to address the matter of a private right of action under the Illinois Code of Corrections, the most prudent course would be to decline to exercise jurisdiction . . .").**

---

cannot use Rule 12 to question the soundness of Johnson's First Amendment pleading. Their motion is properly reviewed under Rule 56's summary judgment standard. *See* FED. R. CIV. P. 12(d) (**"If . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").**

<u>Factual Background</u>

Since 1997, Larry Johnson has been an inmate at Menard Correctional Center in Illinois.  As an avowed Buddhist, he partakes of the IDOC's LVO diet, which does not include meat but does include animal byproducts like milk, cheese, and eggs (Doc. 132-1, 1).  At mealtime, according to Menard's rules, he — along with any other inmate who is on a special diet — must wait at the end of the line to be served.

Like all diets in the IDOC system, the statewide LVO diet is created by Defendant Suzann Griswold-Bailey (Griswold), an Illinois-licensed registered dietician and the IDOC's Food Service Administrator (Doc. 132-1, 1).  Lloyd Hanna, Menard's Dietary Manager, ensures that Menard's dietary department complies with Griswold's menus (Doc. 132-3).  From time to time, food on the IDOC master menu is unavailable, and substitutions are made — either by Hanna or by an "authorized agent" (*id.*).  It is unclear whether those "agents" include Defendants Brickhouse, Lillard, or Winters, who are Food Service Supervisors in charge of serving Menard's prison population.  One of the major sources of protein for LVO inmates is textured vegetable protein (TVP), a soy-based food whose nutritional value has been questioned by at least a few doctors (Doc. 1-1, 59–69).

Until the year 2000, Johnson worked in the kitchen at Menard and could eat anything he wanted (Doc. 136-2, 6; Doc. 137, 2).  When he stopped working the kitchen, Johnson began losing weight.  According to his medical records, Johnson (who stands 5'10") weighed 178 pounds in December 2004, 168 pounds in April 2005, 160 pounds in July 2006, 156 pounds in October 2006, 153 pounds in April 2007, 150 pounds in August 2009, 141 pounds in September 2009, 145 pounds in April 2010, and 153 pounds in September 2010.

At some point prior to filing suit, Johnson began to log the food he consumed (*see* Doc. 137-30, 2, *et seq.*).  Though the days he recorded food are random, the time period over which

Johnson recorded his diet stretched for almost ten months.  Johnson logged the type of food, the amount of food, and (by using a nutritional reference) tabulated the caloric intake for each meal and each day.  Additionally, he recorded the amount of food he claims he could not eat due to very short meal times.  Over the fifty days he logged his calories, Johnson was served an average of 2,045 calories per day, and actually consumed an average of 1,843 calories per day.  Johnson, complaining about the TVP in his diet and the number of calories his diet provided him, filed a formal grievance to his counselor on June 15, 2009 (Doc. 1-1, 2–5).  By July 13, Menard Warden Donald Gaetz had seen and concurred with a grievance officer's recommendation that Johnson's grievance be denied (Doc. 1-1, 25).  On December 1, 2009, IDOC Director Michael Randle signed a denial of Johnson's appeal to the IDOC (Doc. 1-1, 26).

Because it weighs heavily in the application of the facts in this case to governing legal standards, one particularly puzzling discovery matter deserves special mention.

### DEFENDANTS' ADMISSIONS

In March 2011, Defendants Griswold and Hanna responded separately to Johnson's first request for admissions (Doc. 44, Doc. 46).  Taking issue with their responses, Johnson asked the Court to order Griswold and Hanna to amend many of their responses or, alternatively, to deem them admitted (Doc. 51, Doc. 53).  Magistrate Judge Williams found that Defendants did not explain what reasonable inquiries they made into matters for which they claimed to lack sufficient knowledge to admit or deny Johnson's requests (Doc. 68, 3).  *See* **FED. R. CIV. P. 36(a)(4) ("The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny.").**  Judge Williams granted Johnson's motion in part, ordering Griswold and Hanna each to amend sixteen responses or face the possibility of "certain matters being deemed admitted" (Doc. 68, 4).

Bafflingly, neither Griswold nor Hanna complied with Judge Williams' Order. The consequences of that failure are not inconsequential. The factual propositions contained in Johnson's sixteen requests are admitted and, for the purposes of the instant motion, conclusively established. *See* F**ED**. R. C**IV**. P. 36(b) (**"A matter admitted under this rule is** *conclusively established* **unless the court, on motion, permits the admission to be withdrawn or amended.") (emphasis added);** *U.S. v. Kasuboski*, **834 F.2d 1345, 1350 (7th Cir. 1987) ("Admissions made under Rule 36, even default admissions, can serve as the factual predicate for summary judgment.").**

Here, therefore, the Court considers the following propositions to be true as they pertain to Griswold and Hanna:

- If followed, the IDOC's 2009 LVO menu would provide 2,800 or more calories on for 3 of every 35 days.

- If followed, the IDOC's 2009 LVO menu would not meet the USDA Dietary Guidelines of a healthful diet for an active 50-year-old male.

- The IDOC's 2009 LVO menu does not meet USDA Dietary Guidelines for vegetable servings for a physically active 50-year-old male.

- The IDOC's 2009 LVO menu does not meet USDA Dietary Guidelines for fruit servings for a physically active 50-year-old male.

- The IDOC's 2009 LVO menu does not meet USDA Dietary Guidelines for skim milk servings for a physically active 50-year-old male.

- The IDOC's 2009 LVO menu does not meet USDA Dietary Guidelines of servings of whole grains for a physically active 50-year-old male.

- Being forced to eat in a hurry increases the risk of and causes digestive system disorders.

- Large amounts of soy-based TVP reduce the body's ability to absorb calcium, magnesium, copper, iron and zinc.

- Soy-based TVP does not contain all the essential amino acids of a complete protein.

- Large amounts of soy-based TVP increase the risk of developing thyroid disorders, including thyroid cancer.

- Large amounts of soy-based TVP produce serious gastric distress and digestion problems including chronic constipation.

- Large amounts of soy-based TVP block the body's ability to absorb vitamins D and B12, thereby increasing the body's requirement for those vitamins.

- Large amounts of soy-based TVP increase the risk of developing osteoporosis.

- Soy-based TVP contains high levels of aluminum, which is toxic to the nervous system, kidneys and liver.

- Large amounts of soy-based TVP cause harmful medical symptoms including fatigue, lethargy and a constant feeling of being cold.

- Medical research has linked consumption of soy-based TVP with memory loss.

### DEFENDANTS' SUMMARY JUDGMENT MOTION

Defendants move for summary judgment under a number of theories.  No material facts in the record, they say, can possibly show any Defendant violated the Eighth Amendment.  A similar First Amendment argument is made: that Johnson has shown no facts that would lead a reasonable factfinder to conclude his First Amendment rights were violated.  According to the motion, Johnson is entitled to no relief under RLUIPA, Johnson has failed to show any ongoing constitutional violation that would entitle him to injunctive relief, and Defendants are entitled to qualified immunity.

### 1.    *Standard for Summary Judgment*

Summary judgment, which is governed by Federal Rule of Civil Procedure 56, is properly granted only if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Dynegy Mktg. & Trade v. Multiut Corp.*, **648 F.3d 506, 517 (7th Cir. 2011) (citing FED. R. CIV. P.**

**56(a)).**[3]   The party seeking summary judgment bears the initial burden of demonstrating — based on the pleadings, affidavits and/or information obtained via discovery — the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

After a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." ***Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  *See also Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011) ("When a summary judgment motion is submitted and supported by evidence . . . the nonmoving party may not rest on mere allegations or denials in its pleadings")**. A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. ***Anderson*, 477 U.S. at 248.** A mere scintilla of evidence supporting the non-movant's position is insufficient; a party will successfully oppose summary judgment only when it presents definite, competent evidence to rebut the motion. ***Albiero v. City of Kankakee*, 246 F.3d 927, 931–32 (7th Cir. 2001). *See also Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) ("[S]ummary judgment is . . . the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events") (internal quotation marks omitted).** In other words, there is "no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." ***Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010).  *Accord Anderson*, 477 U.S. at 248 (material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party).**

Finally, the Court's role in deciding a summary judgment motion is not to evaluate the weight of the evidence, to judge witness credibility, or to determine the truth of the matter, but rather to determine whether a genuine issue of triable fact exists. ***Nat'l Athletic Sportswear, Inc. v.***

---

[3]     Though Rule 56 was amended in 2010, the amendment did not change the summary judgment standard. ***Sow v. Fortville Police Dept.*, 636 F.3d 293, 300 (7th Cir. 2011)**.

*Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). And, at summary judgment, the Court considers the facts in the light most favorable to the non-moving party — here, Plaintiff Johnson. *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009). The Court also adopts reasonable inferences and resolves doubts in Johnson's favor. *Id.*; *Nat'l Athletic Sportswear, Inc.*, 528 F.3d at 512.

### 2. Eighth Amendment Claims

Though the Constitution does not mandate comfortable prisons, it forbids inhumane ones. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The conditions of a prisoner's confinement are subject to the Eighth Amendment's prohibition of "cruel and unusual punishments." *Id.*; U.S. CONST. amend. VIII.[4] Inmates must be confined under conditions that provide for their basic human needs. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The Eighth Amendment does not require the most intelligent, progressive, humane or efficacious prison administration. *Oliver v. Deen*, 77 F.3d 156, 161 (7th Cir. 1996). Nor must prisons provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans. *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001). But prison officials have a duty to provide inmates adequate clothing, shelter, medical care, and food. *Farmer*, 511 U.S. at 832.

Successfully proving an Eighth Amendment case requires a two-part showing. First, the deprivation alleged must be objectively, sufficiently serious so that an official's act or omission results in the denial of the minimal civilized measure of life's necessities. *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citing *Farmer*, 511 U.S. at 834). Second, the prison official must have the subjectively culpable state of mind known as deliberate indifference — that is, whether the

---

[4] The Eighth Amendment's ban on inflicting cruel and unusual punishments is made applicable to the States by the Fourteenth Amendment. *Hutto v. Finney*, 437 U.S. 678, 685 (1979).

official knew about the risk of harm, had the ability to prevent the harm, and failed to do so. *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009). While injunctive relief is generally available to cure continuing constitutional violations, *Sonnleitner v. York*, 304 F.3d 704, 717 (7th Cir. 2002), recovering damages under § 1983 requires both injury and a causal connection between that injury and the deprivation of a constitutionally protected right, *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999).

In the instant case, Johnson alleges that his diet (both as designed and as administered) is so calorie-deficient that it satisfies the objective prong of the Eighth Amendment analysis, and Defendants were deliberately indifferent to the risks inherent in the diet. Further, he claims that TVP is so unhealthy that it presents an objectively serious risk to those who eat it. Defendants counter that Johnson has presented no facts which establish that his diet is inadequate, that Warden Gaetz and Director Randle have no liability because they were not personally involved with any constitutional violation, and (alternatively) that they are entitled to qualified immunity. As discussed below, some of Johnson's Eighth Amendment claims survive summary judgment, but only insofar as Johnson asks for injunctive relief.

### A.     Objective Prong:  Nutritional Adequacy

Two dietary concerns lie at the heart of Johnson's Eighth Amendment claims: that he's not getting enough calories, and that the textured vegetable protein (TVP) that forms the bulk of his protein intake is such a health risk that the Court should enjoin the IDOC from serving it.

Under the Eighth Amendment, a prisoner's diet must provide adequate nutrition. *Mays*, 575 F.3d at 648. *Accord Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996). The objective analysis focuses on whether the plaintiff was forced to endure conditions that exceeded contemporary bounds of decency of a mature, civilized society. *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994).

Withholding food is not a *per se* objective violation of the Constitution; courts must assess the amount and duration of the deprivation. **Reed v. McBride, 178 F.3d 849, 853 (7th Cir. 1999).** For example, "depriving a person of food for four days would impose a constitutionally significant hardship." **Atkins v. City of Chicago, 631 F.3d 823, 830 (7th Cir. 2011) (citing Reed, 178 F.3d at 853–54).** But a prisoner who gets three square meals a day has no constitutional recourse just because the food is poorly-prepared. **Lunsford, 17 F.3d at 1580.** A diet of "grue" (a baked mash of potatoes, oleo, syrup, vegetables and eggs) might be tolerable for a few days and intolerably cruel for weeks or month. **Hutto v. Finney, 437 U.S. 678, 683, 686–87 (1979).** Serving tainted or sickening food with the effect of causing substantial weight loss would violate the Eighth Amendment. **Prude v. Clarke, 675 F.3d 732, 734 (7th Cir. 2012).** The inquiry is necessarily difficult, imprecise, and contextual. **Lunsford, 17 F.3d at 1579.**

■    *Lack of Calories*

Despite the fact-intensive nature of the analysis, Defendants supplement the record with only two affidavits and edited portions of Johnson's deposition. Of course, the Court also must consider the admissions by Griswold and Hanna. In her affidavit, Defendant Griswold (the IDOC's Food Service Administrator) swears that she approves the LVO master menus and that she "observe[s] the USDA Dietary guidelines" (Doc. 132-1, 1). No medical professional has ever told her, she claims, that that the LVO diet is inadequate (*id.*). Defendant Hanna (Menard's Dietary Manager) ensures compliance with the IDOC menus (Doc. 132-1, 3). He authorizes substitutions when, for example, food listed on the master menu is unavailable. He likewise has never been told that the food served at Menard is inadequate (*id.*). Notably, these affidavits are undercut by the conclusively-established (for this motion and these Defendants) facts from Griswold's and Hanna's admission: that the LVO diet would not meet the USDA guidelines for an active 50-year-old male.

11

To show his caloric intake was nutritionally inadequate, Johnson's evidence includes a handwritten log tracking nine months of his food consumption (Doc. 137-30, 2, *et seq.*).  Using a reference guide (*see* Doc. 137-3), he calculates the total calories he consumed for a randomly-selected sample of more than fifty nonconsecutive days between 2009 and 2010.  Johnson also introduces other prisoners' grievances to bolster his argument.  Griswold and Hanna admit that the LVO menu — which almost always provides less than 2,800 calories — does not meet the USDA Dietary Guidelines for an active 50-year old male.

Even with the Defendants' admissions, Johnson's extensive records about his caloric intake do not create a genuine issue of material remains for trial.  An important premise of his complaint is that 2,800 calories is the appropriate daily nutritional — and therefore constitutional — intake.  Johnson gets that number from a table in a USDA report, where 2,800 calories is the target for an *active* male his age (Doc. 136-5, 3).  The rest of the table shows a wide range of *estimated* calorie requirements, including that — for males who perform only light physical activity — the target caloric intake is between 2,200 and 2,000 calories (*id.*).

The Constitution does not require that Johnson gets enough calories to live an active lifestyle, only that he not be subjected to a diet that is outside the contemporary bounds of decency of a mature, civilized society.  ***Lunsford*, 17 F.3d at 1579.**  Over the fifty days he tracked his caloric intake, Johnson was served an average of 2,045 calories per day (*see* Doc. 137-30, 2, *et seq.*).  Accounting for food he missed because he was in a hurry, the number drops to 1,843 calories per day (*see id.*). Were the standard the 2,800 calories Johnson wants, a fifty-day sample showing an 1,800 calorie per day diet could show a material issue of fact for trial.  But Johnson's caloric intake is within (or close to) the recommendations for a sedentary male.  And even those recommendations do not set the floor for nutritional adequacy under the Constitution.  The Eighth Amendment is not congruent with cherry-picked USDA guidelines.  The Eighth Amendment merely requires that a

prisoner's basic human needs are met. **Rice**, 675 F.3d at 664 (citing *Rhodes v. Chapman*, **452 U.S. 337, 347 (1981)).**

Johnson's conflation of USDA guidelines with Eighth Amendment caselaw is also fatal to his claims that Winters, Hanna, Lillard, and Brickhouse made nutritionally inadequate dietary substitutions, reduced portion sizes, or deleted menu items. For the same reasons, the fact that Johnson had to wait at the end of the chow line for meals does not rise to an objective risk of harm protectable by the Eighth Amendment. Substitutions and deletions occurred, and Johnson occasionally did not eat all the food he was served. But given Johnson's intake of over 1,800 calories per day, even if a fact-finder could (unsurprisingly) conclude Menard's menu was not perfectly aligned with USDA guidelines, no reasonable jury could find that his basic human needs went unmet. Regarding his caloric intake, dietary substitutions, and accelerated eating time, Johnson was simply not denied the minimal civilized measure of life's necessities. **See Townsend**, **522 F.3d at 773.**

As it pertains to Johnson's caloric intake, menu substitutions, and Eighth Amendment claims regarding standing in the back of the chow line, Defendants' motion for summary judgment is **GRANTED** and his Eighth Amendment claim will (in part) be **DISMISSED** with prejudice.

■  *TVP in Johnson's Diet*

Regarding the TVP in the IDOC diet, Defendants' argument boils down to this: the IDOC master menu and Menard diet — including the TVP — are nutritionally adequate, because Hanna and Griswold say so in their affidavits. The documentary evidence that TVP is a health risk is limited to two articles Johnson attaches to the complaint (Doc. 1-1, 59–69). But Griswold and Hanna have admitted (for the purposes of this lawsuit) that TVP is a culinary horror linked with

13

toxic aluminum levels, calcium loss, thyroid cancer, chronic constipation, osteoporosis, and memory loss.  That is enough for Johnson to have met the objective prong vis-à-vis Griswold and Hanna.

As to the other Defendants, Rule 36 does not address whether one defendant's deemed admissions can be used against another defendant in the same case.  Federal courts have concluded that they do not.  *See, e.g., Allen v. Destiny's Child*, 2009 WL 2178676 at *2 (N.D. Ill. July 21, 2009) (citing *Riberglass, Inc. v. Techni-Glass Indus., Inc.*, 811 F.2d 565 (11th Cir. 1987), *and Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997)).  The Court agrees with this conclusion.  But whether the admissions can be used against other defendants on the objective prong is irrelevant, since Johnson cannot make a showing that Randle, Gaetz, Brickhouse or Lillard meet the *subjective p*rong.

## B.   Subject Prong:  Requisite Culpable Mental State

To make a showing of an Eighth Amendment violation, a plaintiff also must demonstrate that a prison official has the subjectively culpable state of mind known as deliberate indifference — that is, the official knew about the risk of harm, had the ability to prevent the harm, and failed to do so.  *Mays*, 575 F.3d at 648.  It is not enough for the inmate to show a defendant *should have* known about a serious risk of harm; the defendant must know of and ignore or disregard the risk.  *See Townsend*, 522 F.3d at 773; *Mays,* 575 F.3d at 648.

Additionally, a defendant must be personally involved with a § 1983 violation to be liable for damages.  Put another way, the defendant must have caused or participated in the alleged constitutional violation for liability to attach.  *Townsend,* 522 F.3d at 775.

Winters, Brickhouse and Lillard are Food Service Supervisors at Menard, in charge of preparing and serving the meals.  While it is plausible they knew about some of TVP's alleged health risks (or at least that Johnson was complaining about TVP), they cannot be subjectively culpable unless they had the ability to prevent the harm.  *Mays,* 575 F.3d at 648.  The three food

14

service supervisors would not have been in a position to alter the amount of TVP on either the IDOC master menu or Menard's chow line, so they had no ability to prevent whatever harm TVP presented.  They were not mentally culpable (the subjective prong has not been met here).

Nor can Johnson establish that Randle or Gaetz were personally involved with any constitutional deprivation.  Director Randle and Warden Gaetz both reviewed grievances that mentioned TVP, but more than that is required to show personal involvement.  The Seventh Circuit has made clear that an official who reviews a complaint is not liable for the underlying, complained-of behavior simply because he reads and dismisses it, which is all Johnson claims happened here. *Burks v. Raemisch*, **555 F.3d 592, 595 (7th Cir. 2009).**  Randle and Gaetz are entitled to relegate dietary decisions to their staff without being subject to § 1983 liability for each of their subordinates' decisions.  *See id.* **([T]he Superintendent of Prisons and the Warden of each prison . . . is entitled to relegate to the prison's medical staff the provision of good medical care.  That is equally true for an inmate complaint examiner) (internal citations and quotation marks omitted).**  *See also Johnson v. Doughty*, **433 F.3d 1001, 1011 (7th Cir. 2006) (warden who denied a grievance entitled to summary judgment because relying on his subordinates did not indicate a "woefully inadequate action evincing a sufficiently culpable state of mind.").**  In other words, Johnson cannot sue Randle and Gaetz for damages just because they denied his grievances.  However, because Randle and Gaetz (or their replacements) would be responsible for executing any possible injunctive relief resulting from Johnson's Eighth Amendment claims, they will remain in the case in their official capacities, if Eighth Amendment claims survive.

And Eighth Amendment claims do survive.  Defendants Hanna and Griswold cannot overcome their admissions, so they cannot escape on summary judgment.  Taking their admissions at face value, Hanna and Griswold *knew* that TVP presented an objectively serious health risk.  They *were* in a position to alter the menu — Griswold on a statewide level, Hanna at an

institutional level — and they *failed* to do so.  At trial, based on the admissions, a reasonable finder of fact could conclude that Hanna and Griswold "knew about [the risk of harm] and could have prevented it but did not." *Mays*, 575 F.3d at 648.

So Johnson's Eighth Amendment claim survives against Hanna and Griswold (and, because they would be the officials responsible for enforcing injunctive relief, against Gaetz and Randle in their official capacities).  But because he has not shown evidence of causation between TVP and a legally compensable injury, the Eighth Amendment can only provide Johnson with injunctive and declaratory relief.

## C.   No Damages Available

Johnson cannot win money damages in this suit.  To recover damages in an Eighth Amendment conditions of confinement case, a plaintiff must show injury and a causal connection between that injury and the deprivation of a constitutionally protected right.  *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999).  *See also Maus v. Murphy*, 29 Fed. Appx. 365, 369 (7th Cir. 2002) ("The basic tort-law rule requiring a plaintiff to show that the defendants caused the plaintiff's injuries applies with equal force to" Eighth Amendment deliberate indifference claims).  Defendants point to the lack of evidence linking TVP or low calories to any health problems suffered by Johnson, and posit that Johnson has failed to put forth any evidence of an objective risk of harm.

That conclusion is incorrect.  An objective risk of harm need not have resulted in an injury for a plaintiff to seek Eighth Amendment protection.  *See Farmer*, 511 U.S. at 845 ("[O]ne does not have to await the consummation of threatened injury to obtain preventive relief.").  A prison official may be enjoined where she knowingly and unreasonably disregarded an objectively intolerable risk of harm (and will continue to do so).  *Id.* at 846.  A prisoner is not required to await a tragic event before obtaining injunctive relief.  *Id.* at 845.  But money damages require a link

16

between an official's deliberate indifference and a plaintiff's injury. *Henderson*, **196 F.3d at 848.**
**Accord** *Lopez v. City of Chicago*, **464 F.3d 711, 722 (7th Cir. 2006) ("compensatory damages**
**are the norm when a plaintiff prevails on a § 1983 claim for constitutional violations and can**
**prove actual damages.");** *Maus*, **29 Fed. Appx. at 369 (plaintiff could not recover damages**
**just by showing exposure to a risk of harm; there must be a showing of actual harm or**
**reasonable certainty of future serious injury).**

Here, the dearth of medical evidence does not indicate a lack of a risk to Johnson —
it indicates the lack of a causal link between any risk and any compensable injury. While Johnson
argues that his fifty lost pounds (over ten years), his dwindling ability to bench press (over ten years),
his slower 5k time (again, over ten years) all result from the LVO diet, he does not respond to
Defendants' argument that he never brought his weight loss (or concerns about TVP) to his doctor's
attention.

Twelve years ago — when he was working in the inmate kitchen and allowed to eat
as much as he wanted — Johnson weighed 190 pounds (Doc. 136-2, 6–7). In isolation, a fifty
pound weight loss over a decade could hypothetically evince harm from a nutritionally inadequate
diet. But in the context of the entire record, Johnson's weight loss (and loss of speed and strength)
indicate he is less active, eats less than he did while working in the kitchen, and has aged ten years.
He is 5'10", he is now 50 years old, and his weight has fluctuated within a 15-pound range (between
156 and 141 pounds) since 2006 (Doc. 137, 6, 11). Johnson's current body weight (back up to 153
pounds) does not establish an ability to recover damages: according to his own submitted evidence
his body mass index and weight, even at 141 pounds, have been healthy for a man his height (*see*
Doc. 136-6, 8).

Johnson, who has never even discussed his diet with the healthcare unit (Doc. 132-1,
16), cannot connect his consumption of TVP (or any other dietary issue) with any legally

17

compensable harm.  So even given an objectively serious risk regarding the TVP in his diet, and even if Defendants ignored that risk, the best Johnson can hope for is that Defendants are enjoined to make the LVO diet more nutritionally adequate by removing TVP.

### D.   Eighth Amendment Qualified Immunity

Qualified immunity protects officers performing discretionary functions from civil liability if their conduct does not violate clearly established constitutional rights that a reasonable person would know about at the time.  *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006).  But qualified immunity shields defendants from paying money damages, not from an action for injunctive relief.  *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 758 (7th Cir. 2012).  As discussed above, damages are not available to Johnson under the Eighth Amendment.   Because Defendants' asserted qualified immunity defense has no bearing on Johnson's remaining Eighth Amendment claims for injunctive and declaratory relief, there is no need for the Court to address qualified immunity here.

So the remaining Eighth Amendment claims in the case are for injunctive and declaratory relief only.  The proper parties in a claim for injunctive relief include the supervisory government officials who would be responsible for ensuring injunctive relief is carried out. *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).  Here, those officials appear to be Griswold (who has responsibility for designing the IDOC diet), Randle (who would supervise the diet's enforcement across the IDOC system), Gaetz[5] and Hanna (who would both implement any new diet at Menard).  *See Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989) **(proper defendants for purposes of injunction were supervisory officials of government agency).**

---

[5]      Randle is no longer the IDOC director, so he will be substituted from the case.  *See* "Motion for Leave to Amend" below.  It also appears Gaetz is no longer Menard's warden. **See *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (substituting Menard's new warden for Gaetz).**  But the Court will wait for the parties to supply the new warden's name before substituting a new official-capacity defendant.

### 3.    *Religious Exercise Claims*

Johnson's suit invokes two provisions — one constitutional and one statutory — that protect his religious rights.   As noted above, his constitutional claim is based on the First Amendment's Free Exercise Clause ("Congress shall make no law . . . prohibiting the free exercise [of religion]"),[6] and the statutory claim is based on RLUIPA.

An initial point: this Court may not inquire into whether Johnson's dietary practices are central to his religion. ***Koger v. Bryan***, **523 F.3d 789, 797 (7th Cir. 2008).** ***See also Gillette v. United States*, 401 U.S. 437, 457 (1971) ("The truth of a belief is not open to question; rather, the question is whether the . . . beliefs are truly held.") (internal citations and quotation marks omitted).**   And while an examination of the sincerity of Johnson's religious beliefs would be within the Court's purview, ***Gillette*, 401 U.S. at 457,** Johnson's sincerity is not an issue before the Court, because it has not been raised by Defendants.

The Court will examine Johnson's claims under the Free Exercise Clause, then turn to RLUIPA, which affords heightened protection to Johnson's exercise of religion. ***Sossamon v. Texas*, 131 S. Ct. 1651, 1655–56 (2011);** ***Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011).** Johnson's religious claims revolve around the policy that requires inmates on a special diet to wait at the end of the chow line for their meal.   According to Johnson, the small amount of time he is given to eat his meals, vis-à-vis other inmates, puts an unjustified and substantial burden on his practice of Buddhism because it puts substantial pressure on him to abandon his beliefs.

### A.    Free Exercise Clause

Prison walls do not sunder inmates from the protections of the Constitution. ***Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011) (citing** ***Young v. Lane*, 922 F.2d 370, 374**

---

[6]      The First Amendment is incorporated as to the states through the Due Process Clause of the Fourteenth Amendment. ***Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940)**.

(7th Cir. 1991) (citing *Turner v. Safley*, 482 U.S. 78, 84 (1987))).  While prisoners retain the right to exercise their religious beliefs, that right is not unfettered.  *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009).  Because it cannot be said that a reasonable person would know just how unfettered Johnson's Free Exercise right need be, Defendants are entitled to qualified immunity.

  The Seventh Circuit has recently articulated the somewhat confused state of Free Exercise jurisprudence as it pertains to prisoners, where two lines of cases seem to control.  In *Employment Division v. Smith*, the Supreme Court held that rules of general applicability, not intended to discriminate against a religion or sect, do not violate the Free Exercise Clause.  *See Grayson v. Schuler*, 666 F.3d 450, 452 (7th Cir. 2012).  In prisoner cases, the Seventh Circuit sometimes relies on *Smith*'s general rule when analyzing Free Exercise claims.  *See Koger,* 523 F.3d at 796 (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993), for the proposition that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice").  *See also Mark v. Gustafson*, 286 Fed. Appx. 309, 312 (7th Cir. 2008).

  But pre-*Smith* caselaw has controlled the analysis in other recent decisions, so it is unclear whether *Smith*'s rule trumps older caselaw when it comes to prisoner litigation.  In *Maddox v. Love*, for example, the Seventh Circuit tested whether a regulation that infringed on an inmate's exercise of religion was reasonably related to a legitimate penological objective.  *Maddox v. Love*, 655 F.3d 709, 719 (7th Cir. 2011) (citing *Turner v. Safley*, 482 U.S. 78, 89–91 (1987)).  Similarly, it is unclear whether *Smith* overruled *O'Lone v. Shabazz*, which required prison authorities to accommodate an inmate's religious preferences if consistent with legitimate penological concerns.  *Grayson*, 666 F.3d at 452–53 (citing *O'Lone*, 482 U.S. 342, 348–50 (1987)).  *See also Vinning-*

*El*, 657 F.3d at 593 ("The Supreme Court has never considered how *Smith* applies to prison and whether it supersedes *Turner* when a prisoner seeks an accommodation.").

Of course, whether *Smith* overruled *Turner* is irrelevant in cases where regulations are arbitrarily created or enforced against one religious group or another. The Free Exercise Clause forbids materially different treatment of different religious faiths. *Vinning-El*, 657 F.3d at 593 (citing *Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991). *See also Grayson v. Schuler*, 666 F.3d at 453 (a Free Exercise case of "outright arbitrary discrimination.").  But this is not a case about arbitrary discrimination. Here, the chow line rule applies with equal force to all inmates on a special diet, regardless of creed. Buddhists like Johnson must submit to the rule, but so must inmates who are vegetarians for non-religious reasons (and, for example, diabetics who avoid certain foods for medical reasons). Johnson offers no evidence that outright discrimination put him at the back of the chow line, which means the rule must be examined in light of *Smith*, *Turner*, and *O'Lone*.

Under *Smith* and its progeny, Defendants are entitled to summary judgment on Johnson's First Amendment claims. Menard's rule is neutral and generally applicable: Johnson cedes that "anybody who is on a special diet would have to wait to the end of the line" (Doc. 132-1, 27). *See Church of Lukumi*, 508 U.S. at 543 ("a rule is not generally applicable if it imposes burdens *only* on conduct motivated by religious belief" in a "selective manner").

Under *Turner* and *O'Lone*, though, an official must provide a reasonable penological purpose (for example, security or economic concerns) to justify a regulation that burdens an inmate's religious exercise. *Maddox*, 655 F.3d at 719; *Ortiz*, 561 F.3d at 669. Determining the reasonableness of prison regulations requires examining factors like whether there is a valid, rational connection between the regulation and the legitimate governmental interest put forward to justify it; whether there are alternative means for an inmate to exercise his asserted right; the impact of any accommodation on guards, other inmates, and the allocation of prison resources generally; and the

absence of ready alternatives.  *Turner*, **482 U.S. at 89–90.**  *Accord Vinning-El,* **657 F.3d at 592–93.**  The test is even less restrictive than that ordinarily applied to constitutional infringements, so as to avoid "unnecessary judicial intrusion into security problems and other prison concerns." *Maddox*, **655 F.3d at 719 (citing** *O'Lone*, **482 U.S. at 348–49).**  Despite the deference courts are instructed to show to prison officials, nowhere in their pleadings, affidavits, or evidence do Defendants attempt to offer any penological reason for the Menard rule at issue here.  *See DeSilva v. DiLeonardi*, **181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record.").**

Defendants do, however, manage to assert a broad qualified immunity defense (Doc. 131, 1).  As described above, qualified immunity protects officers performing discretionary functions from civil liability if their conduct does not violate clearly established statutory or constitutional rights that a reasonable person would know about at that time.  *Mustafa*, **442 F.3d at 548.**  In evaluating a qualified immunity claim, a court must ask two things: (1) whether the facts the plaintiff alleged "make out a violation of a constitutional right," and (2) if so, whether that right "was clearly established at the time of defendant's alleged misconduct."  *Van den Boesch v. Raemisch*, **658 F.3d 778, 788 (7th Cir. 2011) (quoting** *Pearson v. Callahan*, **555 U.S. 223, 232 (2009)).**  Courts may address either prong first.  *Pearson*, **555 U.S. at 236.**

Here, uncertainty exists as to the contours of Johnson's Free Exercise rights.  Given the conflicting messages contained in the caselaw, even if *Turner* and *O'Lone* control Johnson's Free Exercise rights, a reasonable prison official could conclude that *Smith* controls, and that accommodating religion-inspired requests (like Johnson's) to be excluded from generally applicable, neutral rules is not constitutionally mandated.  Johnson's rights were not, therefore, clearly established, and Defendants are entitled to qualified immunity.

But that is not *entirely* the end of Johnson's Free Exercise claims.  Qualified immunity insulates defendants from paying money damages, not from an action for injunctive relief. *Hannemann*, 673 F.3d at 758 (citing *Moss v. Martin*, 614 F.3d 707, 712 (7th Cir. 2010)). Official-capacity suits against state officials that seek only injunctive relief are permitted by 42 U.S.C. § 1983.  *Power v. Summers*, 226 F.3d 815, 819 (7th Cir. 2000).  Regarding Johnson's official-capacity claims, Defendants argue any potential injunctive relief is moot, since Johnson is now in a different cell house and, according to his deposition, things are "a lot better" (Doc. 132-1, 11, 13).

However, as Johnson points out, at any time he could be transferred back to his old cell house, where (construing the facts in his favor) he would again be subject to a continuing constitutional violation.  Johnson is really arguing that his case falls into the "capable of repetition, yet evading review" exception to mootness, which permits adjudication of otherwise-moot cases if (1) the challenged action is too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation the same plaintiff will be subjected to the same action again. *Protestant Memorial Med. Ctr. v. Maram*, 471 F.3d 724, 731 (7th Cir. 2006).  Both elements of the mootness exception are satisfied here.  Johnson was transferred to a different cell block before his case could be fully litigated.  He is serving a life sentence and it is virtually certain he will be transferred to other Menard cellblocks (including his old one) sometime in his life.  The Court can rule on Johnson's claims for injunctive relief.

That leaves only the substantive question: whether Menard's chow line rule, which requires inmates on special diets to get their meals last, burdens Johnson's practice of Buddhism. Defendants do not address the issue, so Johnson's  evidence — a grievance from another prisoner (Doc. 137-27, 2–3) plus fifty pages of a journal recording when he had scant time to eat (Doc. 137-30, 1 through Doc. 137-33, 4) — goes unchallenged and is enough for Johnson's official-capacity Free Exercise claims to survive summary judgment.

The weight of any burden on Johnson's religious exercise, as well as any countervailing government interest in the Menard rule, also survives in the form of Johnson's RLUIPA claims.

### B.   **RLUIPA**

Compared to either strain of Free Exercise jurisprudence, RLUIPA affords heightened protection to prisoners' exercise of religion. *Sossamon,* **131 S. Ct. at 1655–56;** *Vinning-El,* **657 F.3d at 594.** RLUIPA prohibits prisons from imposing a substantial burden on an inmate's religious exercise — but even a substantial burden can be justified if it (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that interest. *Nelson v. Miller,* **570 F.3d 868, 887 (7th Cir. 2009) (citing 42 U.S.C. § 2000cc-1).**

Because sovereign immunity shields state officials from monetary damages in their official capacity, *Sossamon,* **131 S. Ct. at 1663,** and RLUIPA does not allow for money damages against prison officials in their individual capacity, *Nelson,* **570 F.3d at 886–89,** injunctive relief is the only possible remedy RLUIPA affords Johnson.

Defendants, in a one-paragraph argument, ask for summary judgment on Johnson's RLUIPA claims because "prison officials are shielded from monetary damages" in their official and individual capacities (Doc. 132, 12). That much is true. But it ignores the fact that Johnson sued Defendants in their *official* capacities for declaratory relief and an injunction. Those claims will proceed to trial.

### C.   **Proper Parties for First Amendment and RLUIPA Relief**

The proper parties in a claim for injunctive relief include the supervisory government officials who would be responsible for ensuring injunctive relief is carried out. *Gonzalez v. Feinerman,* **663 F.3d 311, 315 (7th Cir. 2011).** Since the rule at issue here is limited to Menard, IDOC Director Randle is dismissed as to Johnson's religious claims. *See Burks,* **555 F.3d at 596**

**(public employees are responsible for their own misdeeds but not for anyone else's).**  The Menard dietary staff, along with Defendant Griswold, will likewise be dismissed as to the RLUIPA and Free Exercise claims.  Warden Gaetz (or, if Gaetz is no longer at Menard, the current warden) is the defendant responsible for ensuring inmates have adequate time to eat (*See* Doc. 13, 7).  He is also the Menard official responsible for seeing that any injunctive relief regarding the chow line rule is carried out, so he will remain as a Defendant in his official capacity.

As discussed above, the factual record as it currently stands cannot support a finding that Johnson's practice of Buddhism was not burdened, substantially or otherwise.  And Defendants offer no state interest — compelling or otherwise — as justification for Menard's chow line policy.  So regarding Johnson's religious rights, it may be that there is (under RLUIPA) no substantial burden on Johnson's practice of Buddhism; it may be that Gaetz can justify (with a compelling reason under RLUIPA or a reasonable penological purpose under *Turner* and *O'Lone*) the burdens on Johnson's religious practice.  But those questions will be sorted out at trial.  On the record before the Court, summary judgment on Johnson's religious claims is not warranted.

Insofar as Defendants' motion for summary judgment targets Johnson's First Amendment and RLUIPA claims, the motion (Doc. 131) is **GRANTED IN PART** and **DENIED IN PART**.  Regarding those claims, all the defendants shall be **DISMISSED** from the suit in their *individual* capacities, and Defendants Randle, Griswold, Hanna, Winters, Lillard, and Brickhouse will be **DISMISSED** from the case in their *official* capacities.  Johnson's official capacity claim for injunctive and declaratory relief under RLUIPA and the Free Exercise Clause will proceed against Warden Gaetz.

The Court does not make today's decision without noting its duty to, where possible, avoid overreach into the administration of prisons.  *See Farmer*, 511 U.S. at 846–47 **(courts should not become "enmeshed in the minutiae of prison operations") (citing** *Bell v.*

25

*Wolfish*, 441 U.S. 520, 562 (1979)).  But Mr. Johnson brought forth evidence where Defendants did not, Defendants made procedural missteps that led to binding admissions, and Defendants failed to take advantage of an opportunity the Court provided to file a reply brief.  Giving deference to prison officials does not change the summary judgment standard.  It was the prison officials' burden to show that no material fact remained for trial.  They failed to do so.

### REMAINING MOTIONS

Also before the Court are three other motions.

### *Plaintiff's Motion for Leave to Amend (Doc. 126)*

Johnson moves to amend the complaint by adding current IDOC Director S.A. Godinez — in his official capacity — as a Defendant.  Leave to amend should, of course, be freely given when justice so requires.  **FED. R. CIV. P. 15(a)(2).**  The Court **GRANTS** the motion to amend (Doc. 126) here.  Defendant Randle, who is no longer the IDOC Director, was only subject to the remaining claims for equitable relief in his official capacity.  Since Godinez is now the state official responsible for ensuring any IDOC-wide injunctive relief (still a possibility on Johnson's Eighth Amendment claims) would be carried out, he is — in his official capacity only — a proper party.  *See Gonzalez v. Feinerman*, **663 F.3d 311, 315 (7th Cir. 2011) (substituting new warden as the proper party for an official capacity claim for injunctive relief).**  The Clerk is therefore **DIRECTED** to terminate Michael Randle from the case, and add S.A. Godinez (in his official capacity) as a defendant. Furthermore, the parties are **DIRECTED** to notify the Court as to any other IDOC personnel changes that would necessitate a change in the official-capacity defendants in this case.

### *Plaintiff's Motion for Judgment on the Pleadings (Doc. 145)*

Dispositive motions in this case were originally due in October 2011.  Magistrate Judge Williams granted Johnson one extension (until November 18, 2011) to file any dispositive

motions, but denied a subsequent motion to extend (*see* Doc. 142).  On March 5, 2012 — over a hundred days after the November deadline had passed — Johnson filed a motion for judgment on the pleadings pursuant to Rule 12(c) (Doc. 145).

Like summary judgment motions, motions under Rule 12(c) are "directed towards a final judgment on the merits."  *Republic Steel Corp. v. Pennsylvania Eng'g Corp.*, **785 F.2d 174, 178 n.2 (7th Cir. 1986)**.  In other words, 12(c) motions are dispositive.  Johnson's motion (Doc. 145), filed over three months past the deadline, is untimely and therefore **DENIED**.  *See Spears v. City of Indianapolis*, **74 F.3d 153, 157 (7th Cir. 1996) (Courts have "a right to assume that deadlines will be honored.").**

### *Plaintiff's Motion for Summary Judgment (part of Doc. 136)*

In December 2011, near the end of his summary judgment response brief, Johnson moved under Rule 56(f)(1) for an "order of summary judgment for the nonmoving party" (Doc. 136-3, 10).  Rule 56 allows courts to grant summary judgment for a nonmovant after giving notice and reasonable time to respond.  **FED. R. CIV. P. 56(f)(1).**  But Johnson cannot be both a movant and a nonmovant for the purposes of the same motion.  In reality, his motion is an attempt to file a cross-motion for summary judgment.  As discussed above, Johnson's dispositive motions were due on November 18, 2011, almost a month before he asked the Court for summary judgment.  His motion is **DENIED** as untimely.

### CONCLUSION

For the foregoing reasons, the Court **ORDERS** as follows.

- The Clerk is **DIRECTED** to edit the docket sheet to replace "Gatez" with "Gaetz," replace "Loyd" with "Lloyd," and replace "Brockhouse" with "Brickhouse."

- Defendants' Motion for Summary Judgment (Doc. 131) is **GRANTED IN PART and DENIED IN PART**.  All claims against   Defendants   Lillard,   Brickhouse,   and   Winters   are

**DISMISSED WITH PREJUDICE**.  The individual-capacity claims against Defendants Randle, Griswold, Gaetz and Hanna are **DISMISSED WITH PREJUDICE**.

- Plaintiff's Motion for Leave to Amend his complaint (Doc. 126) is **GRANTED**.  The Clerk is **DIRECTED** to terminate former IDOC Director Michael Randle as a Defendant on the docket sheet and replace him with current IDOC Director S.A. Godinez (in his official capacity).

- Plaintiff's Motion for Judgment on the Pleadings (Doc. 145) is **DENIED** as untimely.

- Plaintiff's Motion for Summary Judgment (part of Doc. 136) is **DENIED** as untimely.

Remaining for trial following the Court's rulings are Johnson's claims for injunctive and declaratory relief.  A claim for an injunction is, of course, a claim for equitable relief. *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 648 (7th Cir. 2002).  *Accord Dexia Credit Local v. Rogan*, **629 F.3d 612, 625 (7th Cir. 2010) ("Legal remedies traditionally involve money damages, while equitable remedies are typically coercive and enforceable directly on the persons or things to which they are directed.").** Such claims do not entitle either party to a jury trial.  *Marseilles Hydro Power*, 299 F.3d at 648. And though an action for declaratory judgment is neither legal nor equitable, when (like here) a declaratory judgment action is cleaved to a purely equitable cause of action, there is no Seventh Amendment right to a jury trial.  *Id.* at 648–49.

So while the case was originally set to be heard by a jury, it is **RESET** as a **BENCH TRIAL** on July 23, 2012 at 9:00 a.m.

The trial will resolve the following official-capacity claims:

1. Whether Johnson is entitled to injunctive and declaratory relief against Godinez, Gaetz, Griswold and Hanna on his Eighth Amendment claims regarding TVP;

2.  Whether Johnson is entitled to injunctive and declaratory relief against Gaetz on Johnson's First Amendment claims; and

3.  Whether Johnson is entitled to injunctive and declaratory relief against Gaetz on Johnson's RLUIPA claims.

Counsel are scheduled for a final pretrial conference before Magistrate Judge Stephen C. Williams on June 20, 2012 at 9:00 am.  Bench trial will proceed before the undersigned District Judge on the three claims outline above at 9:00 am on July 23, 2012.  Given the age of this case and the docket constraints confronting the Court, the undersigned Judge is disinclined to grant any extensions or trial continuances.

IT IS SO ORDERED.

DATED: May 31, 2012

s/Michael J. Reagan
MICHAEL J. REAGAN
United States District Judge